IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>ANTHONY T. ALSTON | No. 04-515 |

**MEMORANDUM & ORDER**

Presently before the court is defendant's motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. *See* Docket No. 74. Mr. Alston contends that he was denied a fair trial by the improper testimony of a government witness. The testimony, which was immediately stricken, was that Mr. Alston had been on parole shortly before the alleged crime.[1]

This court may grant a criminal defendant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The court may . . . grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determines that an error at trial had a substantial influence on the verdict." *United States v. Enigwe*, No. 92-

---

[1] Ruling on Mr. Alston's motion has been delayed because, given the complexity of the competing prosecution and defense narratives presented at the trial, the court felt that to rule responsibly on the motion, with a view to assessing the likely impact of the improper testimony, required a review of the entire trial transcript. Preparation of the transcript, and subsequent thorough review, took time.

257, 1992 WL 382325, at *4 (E.D. Pa. Dec. 9, 1992). On a motion for a new trial under Rule 33, the court "exercises its own judgment in assessing" the evidence rather than viewing it in the light most favorable to the government. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).

"'[E]vidence of a prior conviction has long been the subject of careful scrutiny and use at trial' because of the danger that the jury might convict, not based on the evidence, but because it feels the defendant is a 'bad person.'" *United States v. Singh*, 261 F.3d 530, 534 (5th Cir. 2001). There is especial reason for concern where the jury's decision hinges on the jury's assessment of the defendant's credibility as a witness. *See, e.g.*, *id*. (reversing conviction for harboring illegal aliens where case turned on whether the jury credited defendant's testimony that he did not know his employees were working illegally and where, due to the court's erroneous refusal to sever a felon-in-possession count, jury heard evidence that defendant had been convicted of a felony); *United States v. Hall*, 85 F.3d 367 (8th Cir. 1996) (affirming grant of new trial where it was learned after trial that jurors had overheard mention of other alleged crimes by defendants that had been excluded from trial, because the jurors' ability "to weigh the relative credibility of witnesses in a case that turned almost entirely on whose version of events the jury found more credible" would be "severely impaired when it improperly received information that besmirches the defendants' character"); *Martin v. Parker*, 11 F.3d 613, 616-17 (6th Cir. 1993) (noting that where "cases . . . turn on the relative credibilities of the defendant and the prosecuting witness, . . . a strict adherence to the rules of evidence . . . is required to

ensure a fair trial").

The court must "presume that the jury will follow a curative instruction unless there is an 'overwhelming probability' that the jury will be unable to follow it and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993) (internal citations omitted) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)); *see also United States v. Fisher*, 10 F.3d 115, 119 (3d Cir. 1993) (affirming denial of mistrial where court immediately struck and instructed the jury to disregard government witness's mention of a prior prosecution of the defendant, where it was clear that the government's question was not intended to solicit the reference).

The instant charges against Mr. Alston for interfering with interstate commerce by robbery and being a felon in possession of a weapon arose from an attempted jewelry store robbery. Both Mr. Alston and the jewelry store owner testified to the following sequence of events: On the morning of December 17, 2003, the jewelry store owner "buzzed" Mr. Alston into the store. Mr. Alston gave him some rings to appraise. This was Mr. Alston's second visit to the store; he had sold rings to the owner approximately three weeks earlier. The two men were positioned opposite one another, with the counter between them. While the owner was examining the rings, a third man — never identified — appeared at the store's front door. The jewelry store owner asked Mr. Alston if he knew the man, and Mr. Alston said he did not. The owner buzzed the third man into the store. That man pulled out a gun and tried to rob the store. The jewelry store owner

seized his nearby .357 revolver, accused Mr. Alston of being in league with the third man, and ordered Mr. Alston to the floor. At some point, the jewelry store owner shot Mr. Alston in the arm and shoulder. The owner also suffered gunshot wounds, although it is disputed whether the owner was shot by Mr. Alston or the third man. At some point, the third man exited the store. The jewelry store owner went into the store's back room to retrieve a second gun from his safe; he said something to that effect to Mr. Alston, who followed him. The two men physically fought with one another, smearing a considerable amount of blood in the back room.

The police who arrived first on the scene observed, from their positions outside the jewelry store, the two men emerge from the back room, only the jewelry store owner visibly holding a gun, and then observed them go back into the back room. When the men emerged again a short while later, the men took notice of the police. The owner buzzed the police into the store, Mr. Alston obeyed the police order to drop to the floor in the middle of the store, and the owner remained behind the counter.

In collecting evidence from the scene, the police found a nine-millimeter pistol in a garbage can in the back room. A line of blood on the floor led across the back room to the garbage can. Both Mr. Alston and the jewelry store owner were bleeding profusely due to their wounds. Mr. Alston testified that he did not know how the gun got into the garbage can, because he did not have the gun, and the third man never went into the back room, and the jewelry store owner was always in Mr. Alston's sight. There was no back entrance into the store; the only entrance was the front door, through which one had to be

buzzed in or out using buttons located behind the jewelry counter.

The police also found nine fired cartridge cases. Three of the cartridge cases were for nine-millimeter bullets. The government's ballistics expert gave uncontradicted testimony that, based on markings on the fired cartridge cases, they were fired from the nine-millimeter pistol recovered in the garbage can.[2]

The other six fired cartridge cases consisted of four .357 bullet cases and two .38 bullet cases. The government's ballistics expert gave uncontradicted testimony that, based on his analysis of the markings on the fired cartridge cases, the four .357 cases had been fired from the jewelry store owner's revolver. Although he was unable to determine from the .38 bullet cases whether they too had been fired from the revolver, he testified that the owner's revolver was capable of firing the .38 bullets. The revolver holds six rounds of ammunition.

The government's case that Mr. Alston had committed robbery did not rest on proving that Mr. Alston was in league with the unidentified third man. According to the jewelry store owner's testimony, during the chaos after the third man's entry, Mr. Alston took $300 that was sitting by the cash register. Two police officers testified that Mr. Alston was pulling currency out of his trouser pockets in a furtive manner while lying on

---

[2] When recovered by the police, that pistol had a bullet jammed in its chamber as well as four bullets left in its magazine. The police also found a live, unfired nine-millimeter bullet on the floor of the jewelry store. The pistol is capable of holding eight bullets in the magazine, plus one in the chamber, for a total of nine bullets. There were nine nine-millimeter bullets accounted for at the scene: the one unfired bullet on the floor; the one bullet jammed in the pistol's chamber; the four rounds in the pistol's magazine; and the three fired cartridge cases.

the floor after the officers entered the store and ordered Mr. Alston to the floor. Photographs entered into evidence at trial pictured bloodied dollar bills on the floor of the jewelry store where, the officers testified, Mr. Alston was lying.  A phone bill addressed to the jewelry store owner and $681 in currency were recovered from Mr. Alston's pockets.

Mr. Alston testified that he did not have a gun, did not take any money from the counter, and was caught in the cross-fire between the third man and the owner.  He testified that, while he and the owner were in the back room of the store, the owner tried to pay him off, apologizing for shooting Mr. Alston by mistake.  According to Mr. Alston, the owner unsuccessfully tried to push money into his rain jacket.  He testified that he was carrying $681 in his pocket because he had taken money out of the bank in order to purchase a present for his son.

The jewelry store owner testified that, after the third man entered the store, Mr. Alston, who had been on the floor at the owner's order, leaped up and began firing a gun at the owner.  The owner testified that when he went into his back room to retrieve his other gun from his safe, Mr. Alston followed him.  In their physical altercation, the jewelry store owner wrestled Mr. Alston's gun from Mr. Alston.  The owner tried to shoot out the rest of the bullets, but the gun appeared to be empty.  He denied putting the gun in the garbage can and testified that he did not know what happened to it; he could hardly see at the time, because he has one blind eye and blood obscured his vision from his other eye.  Upon hearing the voices of the police, he buzzed them in.

In its order on the motions *in limine*, the court denied the government's motion to admit evidence that Mr. Alston was on parole at the time of the alleged robbery. *See* Docket No. 60. The court granted Mr. Alston's motion to bifurcate trial of the robbery and felon-in-possession charges. *See id*.

The improper testimony that forms the basis of the instant motion was given by Jan Walker, in whose house Mr. Alston had lived from approximately July through October of 2003. The government called Ms. Walker as a witness because the serial number of the nine-millimeter pistol recovered in the garbage can at the scene of the robbery matched the serial number of a gun she purchased for use in her work as an armed security guard. Ms. Walker testified that this gun was missing after her boyfriend's house was robbed on November 4, 2003. During the government's direct examination of Ms. Walker, the following occurred:

> Q: And how did – how was it that he [Alston] became a tenant of yours? Can you just describe what happened?
> A: Uhm, let's see, during the time he was working at Spaghetti Warehouse he was saying that he was on parole or something like that, he had –
> Mr. Cooper: Objection, Your Honor.
> The Witness: I'm sorry.
> Mr. Cooper: Can I see the Court at sidebar?
> The Court: Jury will disregard that statement. We have no foundation anyhow so it's to be disregarded.

Tr. 10/4/07 at 6. The government then resumed questioning Ms. Walker. In a sidebar held at the conclusion of the government's direct examination, the defense moved for a mistrial. The court denied the motion, stating that the improper testimony appeared to be "an unfortunate consequence that was not intended by the Government," and that the

court was "not persuaded that it taints the entire case." *Id*. at 19.³

---

³ The transcript of the sidebar, in its entirety, is as follows:

Mr. Cooper: Judge, (inaudible) with regard to (inaudible) and regarding my client being paroled, (inaudible) direct examination told to disregard it, that there's no foundation. (Inaudible) for the record at this point to move to strike based on that because (inaudible) specifically, we discussed that, he specifically said that — the Court ruled and it was not coming into this case, and it came into this case.

The Court: Well, then —

Mr. Cooper: And, you know, he had no clue that that was coming in, it was a total surprise that she would explain that he was on parole (inaudible). He's got no — there's no reason for him even elicit that testimony, the reason he lived with her — he lived with her. The reason is completely irrelevant, so we move for a mistrial right now.

Mr. Inden: Your Honor —

The Court: You're not suggesting it was advertent on the part of the Government.

Mr. Cooper: I'm sorry?

The Court: You're not suggesting it was advertent on the part of the Government?

Mr. Cooper: Excuse me?

Mr. Inden: Purposeful.

Mr. Cooper: Am I not suggesting that it was purposeful? He asked her the question, why did he come to live with you. He knows the answer to that, just as well as we did.

Mr. Inden: For the record, Your Honor, it was —

Mr. Cooper: Sorry —

Mr. Inden: — as much a surprise to me, as it was to the defense and everybody else in the courtroom. When I spoke with Ms. Walker both today and on prior occasions, she told me that he came to live with her because he was down and out, he was down on his luck and she was just being nice.

I did not specifically tell her not to mention that, only because I had no clue that that was what she was going to say. And I think that to the extent that there is any prejudice, it can be cured with a limiting instruction in addition to what the Court has already said if the defense wants such an instruction.

Mr. Cooper: The jury has heard the evidence. You can limit it all day, it's like don't look at the elephant in the room, I mean it comes out. It wasn't supposed to be here and he knows that. I'm sorry, Your Honor.

The Court: I'm not sure which thing you're sorry about, Mr. Cooper. But if you're — if the defense is taking the position that this was deliberate on the Government's part, then I would have to tell you that that's inconsistent

Having considered the entire trial transcript in order to rule on the instant motion, the court remains unconvinced that Ms. Walker's improper testimony, immediately stricken, was so prejudicial as to deny Mr. Alston a fair trial. Although the outcome of the case depended in part on the jury's assessment of Mr. Alston's testimony, this was not a case where the jury's entire decision boiled down to weighing Mr. Alston's credibility against the testimony of the complaining witness. Rather, the jury was also presented with considerable ballistic and other crime-scene evidence, the testimony of the police officers who first arrived on the scene, and evidence linking Mr. Alston to the pistol recovered at the scene. The circumstantial evidence strongly weighed in favor of the jewelry store owner's account of the events, rather than Mr. Alston's: the nine-millimeter pistol in the garbage can had been stolen recently from Mr. Alston's former landlord; the pistol was found in a garbage can in the back of the store room, where Mr. Alston admitted the third man did not go; the jewelry store owner did not hide his revolver from the police or deny shooting Mr. Alston, undermining the notion that the owner had

---

                    with my observation of what happened.
                        If I thought it was deliberate on the part of the Government, I would declare a mistrial, and it would be highly inappropriate.
                        I don't think that that was Mr. Inden's intention. We have an unfortunate consequence that was not intended by the Government.
                        I've told the jury to disregard it, I hope they will be able to do so, because I think it's simply unfortunate, but I'm not persuaded that it taints the entire case. I'm going to deny your motion for a mistrial.

Mr. Inden:     And obviously the Government has no intention of making use of that information in other part of the trial.
The Court:    So that's my resolution
Mr. Cooper:  Yes, sir.
Tr. J. Walker's Test., 10/3/07, at 16-19.

concealed the pistol; officers observed Mr. Alston pulling money out of his trouser pockets, contradicting Mr. Alston's testimony that the store owner had tried to shove money into Mr. Alston's jacket; and Mr. Alston had the jewelry store owner's phone bill in his pocket along with the $681.[4]  Given the strength of the government's case, and the fact that there was so much evidence from the crime scene from which the jury could attempt to piece together the events, the court finds that Ms. Walker's improper testimony was not "devastating" to Mr. Alston's case, and that there is no "'overwhelming probability' that the jury [was] unable to follow" the court's instruction to disregard the improper testimony.  *Newby*, 11 F.3d at 1147 (quoting *Greer*, 483 U.S. at 766 n.8).

**AND NOW**, this 7th day of April, 2008, **IT IS ORDERED** that defendant's motion for a new trial, *see* Docket No. 74, is **DENIED**.

/s/ Louis H. Pollak
_____
Pollak, J.

---

[4] The court declines to make a finding that Mr. Alston's testimony was, on the basis of his demeanor, less credible than that of the jewelry store owner.  Neither witness's testimony was entirely credible.  Mr. Alston's testimony regarding why he was carrying $681 in his pocket seemed particularly vulnerable.  He testified that he had recently gotten the money out of the bank to purchase a present for his son, but he also admitted telling the police that he had come to the jewelry store to sell rings in order to make money to buy the present.  The anticipated present for his son was simply "clothes."  Meanwhile, the jewelry store owner failed to identify the defendant at trial, testifying that he thought that the man who came in to sell rings for the second time was much taller than Mr. Alston.  Further, the owner gave conflicting testimony regarding a central part of the government's case, Mr. Alston's alleged theft of the $300.  The owner first testified that Mr. Alston seized the money before beginning to shoot him, and then subsequently testified that Mr. Alston seized the money when the owner went to the back room to get his second gun from the safe.  *Compare* Tr. 10/2/08 at 55 *with id*. at 77.